

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 05 CV 10166

----------------------------------------------------------------------x

HUGHES HOLDINGS, LLC, GLOBAL ASSET
MANAGEMENT LLC, ALLIED INTERNATIONAL
FUND, INC., ROBERT DEPALO, GARY SCHONWALD,
and SUSAN HEINEMAN,

                                              Case No.

                    Plaintiffs,

                                              **COMPLAINT**

        -against-



PETER ZACHARIOU, FOUNTAINHEAD INVESTMENTS, INC.,
ACCESSIBLE DEVELOPMENT, CORP., ALLAN CARTER,
CHADEL, LTD., PREM RAMCHANDANI, AVI SIVAN,
SHAI BAR LAVI, KURT STREAMS, JOHN D'AVANZO,
JASON FOK, TABACALERA, LTD., TERRENCE DEFRANCO,
ALTITUDE GROUP, LLC, VIRGINIA CASADONTE and IGIA, INC.,

                    Defendants.

----------------------------------------------------------------------x

        Plaintiffs Hughes Holdings, LLC, Global Asset Management LLC, Allied International Fund,

Inc., Robert DePalo, Gary Schonwald, and Susan Heineman, by and through their attorneys,

Kurzman Eisenberg Corbin Lever & Goodman, LLP, complain of the defendants and allege:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this action pursuant to 15 U.S.C. § 78j(b) of the Securities Exchange

Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities and

Exchange Commission, 17 C.F.R. § 240.10b-5.

2.      This Court has jurisdiction over this action pursuant to 15 U.S.C. §78aa, and pursuant

to principles of supplemental jurisdiction under 28 U.S.C. § 1367.

3.      Venue is proper in the Southern District of New York pursuant to 15 U.S.C. § 78aa,

and 28 U.S.C. §§ 1391(b). Many of the events and omissions giving rise to the claims alleged herein

occurred in this District.

## INTRODUCTION

4.     This action arises from a reverse merger of the business of Tactica International, Inc. ("Tactica") into the valueless public shell known as Diva Entertainment, Inc. ("Diva"), to form a publicly traded company known as IGIA, Inc. ("IGIA").

5.     Tactica's management failed to disclose Tactica's true financial circumstances both before and after the merger. Upon information and belief, Tactica's management acted to induce the merger, and to thereby attract investors by creating a public vehicle.

6.     Diva's controlling shareholders conducted full and complete pre-merger due diligence and had continuing access to Tactica's auditors. Upon information and belief, the shareholders of Diva therefore knew, but did not disclose, Tactica's true and accurate financial condition. Nevertheless, upon information and belief, certain of Diva's direct and indirect shareholders sold IGIA shares short in Canada into the open market against a "box" of IGIA shares received in the merger, thereby realizing substantial value on their otherwise valueless prior holdings in Diva.

7.     Defendants were, and are, certain senior officers and controlling shareholders of Tactica and IGIA, and certain of the Diva control persons, through their direct and indirect shareholdings.

8.     Unaware of the true negative and declining financial condition and prospects of IGIA, and its predecessor Tactica, and before IGIA's true and declining financial condition was made publicly known, plaintiffs purchased IGIA stock both privately, through a purchase of Diva preferred stock (which was subsequently converted into IGIA common stock) in conjunction with the merger, and publicly through subsequent open market transactions. Plaintiffs also received certain shares as a consequence of the introduction of Tactica and Diva. Neither Plaintiffs, nor any of their affiliates,

2

had access to the true and accurate Tactica financial information -- and in making their purchases relied on the same financial picture that Tactica/IGIA painted for the general public -- which was not disclosed by the Diva Defendants.  In addition, based upon defendants' fraudulent representations and omissions, plaintiffs retained a substantial portion of their IGIA holdings, notwithstanding that the company was in a financial freefall and their holdings were soon to become essentially worthless. This action is brought to redress Plaintiffs' losses based upon defendants' fraud.

## PARTIES

9.      Plaintiff Hughes Holdings, LLC ("Hughes") is a limited liability company organized under the laws of the State of Delaware.

10.     Plaintiff Global Asset Management LLC ("Global") is a Limited Liability Company organized under the laws of the State of Delaware.

11.     Plaintiff Allied International Fund, Inc. ("Allied")  is a Corporation organized under the laws of the State of New York.

12.     Plaintiff Robert DePalo ("DePalo") is an individual who resides within the State of New York.

13.     Plaintiff Gary Schonwald ("Schonwald") is an individual who resides within the State of New York.

14.     Plaintiff Susan Heineman ("Heineman") is an individual who resides within the State of New Jersey.

15.     Defendant Peter C. Zachariou ("Zachariou") is, upon information and belief, an individual who resides within the State of New York, and controlled the pre-merger majority of Diva's shares through his wholly owned entity Havilland, Inc. ("Havilland").

16.     Defendant Fountainhead Investments, Inc. ("Fountainhead") is, upon information and belief, a Delaware corporation with offices at 185 Varick St., New York, New York 10014, and was and is operated under Zachariou's complete dominion and control.

17.     Defendant Allan Carter ("Carter") is, upon information and belief, and individual who resides at 23414 Torre Circle, Boca Raton, FL 33433, and was a Diva shareholder.

18.     Defendant Chadel, Ltd. ("Chadel") is, upon information and belief, a limited liability company, with principle executive offices at c/o Linita Bendrihem, Zurbano 73, 5 Int., Madrid Spain, and was a Diva shareholder.

19.     Defendant John D'Avanzo ("D'Avanzo") is, upon information and belief, an individual whose address is currently unknown, and was a Diva shareholder.

20.     Defendant Jason Fok ("Fok") is, upon information and belief, an individual whose address is presently unknown, and was a Diva shareholder.

21.     Defendant Tabacalera, Ltd. ("Tabacalera") is, upon information and belief, a limited liability company, with principal executive offices at c/o Linita Bendrihem, Zurbano 73, 5 Int., Madrid Spain, and was a Diva shareholder.

22.     Defendant Terrence DeFranco ("DeFranco") is, upon information and belief, an individual who resides at 108 Saucon View Dr., Bethlehem, Pennsylvania18015, and was a Diva shareholder.

23.     Defendant Altitude Group, LLC ("Altitude") is, upon information and belief, a New York limited liability company, with executive offices at located at 2264 82nd Street, Brooklyn, NY 11214, and was a Diva shareholder.

H:\51103\0005\JL0082.DOC

24.     Defendant Accessible Development Corporation ("Accessible") is, upon information and belief, a New York corporation, with principle executive offices at 1787 McDonald Ave, Brooklyn, NY 11230, and was a Diva Shareholder.

25.     Upon information and belief, at all relevant times, Defendant Virginia Casadonte ("Casadonte") was, and is, a resident of Northport, New York, and was a Diva shareholder.[1]

26.     Upon information and belief, Defendant Prem Ramchandani ("Ramchandani") was, and is, upon information and belief, an individual who resides within the State of New York, was a senior officer of Tactica, and was (and is) a senior officer of IGIA, who plays an active daily role in IGIA's management and operations.

27.     Upon information and belief, Defendant Avi Sivan ("Sivan") was, and is, an individual who resides within the State of New York, was a senior officer of Tactica, and was (and is) a senior officer of IGIA, who plays an active daily role in IGIA's management and operations.

28.     Upon information and belief, defendant Shai Bar Lavi ("Bar Lavi") is an individual who resides at 199 West Shore Road, Kings Point, New York. Upon information and belief, since the merger between Diva and IGIA defendant Bar Lavi has owned more than ten percent (10%) of the issued and outstanding common stock of IGIA, and has been a corporate insider who has consistently played an active daily role in IGIA's management and operations.

29.     Upon information and belief, defendant Kurt Streams ("Streams") was, and is, an individual whose address is currently unknown. Upon information and belief, subsequent to the merger between IGIA and Diva, and at all times relevant, defendant Streams was the Chief Financial

---

[1] Defendants Zachariou, Fountainhead, Carter, Chadel, D'Avanzo, Fok, Tabacalera, DeFranco, Altitude Accessible and Casadonte shall collectively be referred to herein as the "Diva Defendants."

5

Officer of IGIA, and is a corporate insider who has played an active daily role in IGIA's management and operations. [2]

30.     Defendant IGIA is a corporation incorporated under the laws of Delaware, and maintains an office at 521 Fifth Avenue, New York, New York 10175.

## FACTUAL BACKGROUND

31.     In or about May 2004, plaintiff Robert DePalo, an equity holder of plaintiffs Hughes, and Allied, was approached by Howard Sterling, an investment banker employed by Sands Brothers International, Ltd. ("Sands Brothers"), regarding a privately held company named Tactica, which DePalo was informed by Howard Sterling that he and Sands Brothers "guaranteed" that $10,000,000 was committed and raised for a funding that would occur after a merger between Tactica and a public company.

32.     DePalo indicated that Vertical Capital Partners, Inc. ("Vertical"), an investment banking firm with which he was affiliated, might be interested in having further discussions regarding Tactica and its possible merger with a public company. In or about May 2004, a meeting was held between DePalo, Robert Fallah ("Fallah") – an equity holder of plaintiff Global and also affiliated with Vertical – Sterling, and each of the defendants Ramchandani, Sivan and Streams, to discuss a possible merger involving Tactica.

---

[2]  Defendants Ramchandani, Sivan, Streams and Bar Lavi shall collectively be referred to herein as the "IGIA Defendants."

H:\51103\0005\JL0082.DOC

33.     At this meeting, each of the defendants Ramchandani, Sivan and Streams represented to DePalo and Fallah that Tactica was currently generating gross revenues of approximately $35,000,000 per year and was extremely profitable.  Defendants Ramchandani, Sivan and Streams further represented during this meeting that the $10,000,000 in prospective private placement funds was not even necessary to the sustenance of Tactica's business, but that these funds would enable the company to grow exponentially.

34.     Based upon these representations by these defendants, Vertical , DePalo, Fallah and Schonwald endeavored to locate a publicly traded shell with which Tactica might merge.

35.     Vertical, DePalo, Fallah and Schonwald subsequently identified Diva Entertainment, Inc. ("Diva") as a possible candidate for a merger with Tactica, and introduced Tactica to defendant Zachariou, Diva's control person and, through Havilland, Diva's controlling shareholder.

36.     Diva and Tactica agreed that a merger between Diva and Tactica made sense because it would provide Tactica with access to public markets for financing, which it had never had, and would provide Diva, which was at the time inactive with no material assets or operations, with the prospect of immediate financial viability, as well as potential for growth.

37.     In or about May or early June 2004, Diva and Tactica, each of which were represented by independent counsel, proceeded to engage in due diligence concerning one another.  Thus, upon information and belief, each of the Diva Defendants, as shareholders of Diva or entities affiliated with shareholders of Diva, and Diva's attorneys, were afforded full and complete access to Tactica's auditors and financial information.

H:\51103\0005\JL0082.DOC

38.     Both during and after this due diligence period, DePalo inquired of defendant Zachariou as to the status and results of Diva's due diligence, and of his discussions and negotiations with Tactica. At no time did defendant Zachariou or any of the other Diva Defendants ever inform DePalo that Tactica's operations and financial condition was anything other than had been represented by defendants Ramchandani, Sivan and Streams.

39.     In early June 2004 DePalo expressed to defendants Ramchandani, Sivan and Streams that plaintiffs Hughes and Allied, with which DePalo was affiliated, plaintiff Global, with which Fallah was affiliated, and Schonwald, based upon the aforesaid representations and the apparently forthcoming $10,000,000 placement, would be interested in investing in Tactica and in IGIA. Plaintiffs in fact made such an investment, purchasing 100 shares of Diva's preferred stock for $450,000, from, inter alia, defendant Casadonte.

40.     On or about June 9, 2004, defendants Ramchandani, Sivan and Streams released a written statement of Tactica's operations for the quarter ended May 31, 2004. This statement represented Tactica's gross sales as $7,442,093, which was approximately consistent with defendants' repeated representations that Tactica was a $35,000,000 per year company. The statement also represented operating expenses of only $2,094,000 which, when deducted from the represented gross profit of $3,024,258, indicated operating income that quarter of $940,258.

41.     At no time did defendant Zachariou or any of the other Diva Defendants inform DePalo that the June 9, 2004 financial statement was inconsistent with, or not supported by, their and Diva's due diligence review of Tactica's financial information and condition.

42.     Upon information and belief, each and all of the Diva Defendants actually knew that the June 9, 2004 statement did not accurately reflect Tactica's true financial condition, and was false.

H:\51103\0005\JL0082.DOC

The basis for plaintiffs' belief is that the fact that they and Diva and its attorneys and accountants had full and complete access to Tactica's auditors and financial information and, based upon IGIA's public filings a mere three (3) months later, had to have been aware of Tactica's precipitously declining financial condition.

43.     Indeed, based upon IGIA's subsequently filed Form 10-QSB quarterly report for the period ending May 31, 2004, the June 9, 2004 financial statement was not accurate in certain respects. Specifically, it:

        (i)     understated Tactica's operating expenses by $1,187,213;

        (ii)    overstated Tactica's operating income for the quarter by $414,800; and

        (iii)   overstated Tactica's net quarterly income before income tax by $414,963.

44.     Upon information and belief, the Diva Defendants' motive for concealing the truth about IGIA and Tactica's financial condition and prospects was to assure that the merger transaction was effectuated. The basis for plaintiffs' belief in this regard is that the effectuation of the merger, which would create a viable public market for Diva stock (which would become stock of IGIA), would enable defendant Zachariou and the other Diva Defendants to earn (on otherwise worthless Diva shares) profits by short-selling IGIA stock based upon this non-public inside information that Tactica was, contrary to the information being disseminated by the IGIA Defendants at the time of the short sales, in financial decline. Plaintiffs' belief in this regard is confirmed, by the fact pled below that the Diva Defendants and others actually engaged in this illegal short-selling of IGIA stock in the weeks and months following the effectuation of the merger.

9

45.     On June 11, 2004, in contemplation of the impending merger between Tactica and Diva, and believing Tactica to be financially sound, plaintiffs Hughes, Global and Schonwald, for themselves and as nominees for other purchasers, purchased a total of 100 shares of preferred stock of Diva for $450,000, from, inter alia, defendant Casadonte.

46.     Moreover, Tactica in fact insisted that the preferred stock be converted to common as a necessary pre-condition of the merger and, further, knew and approved of the nominees who would be holding common stock in addition to Hughes, Global and Schonwald.

47.     On June 11, 2004, pursuant to a Securities Purchase Agreement and Plan of Reorganization ("Merger Agreement"), Tactica merged with Diva, which changed its name to IGIA, and Tactica, the operating entity, became a wholly owned subsidiary of IGIA.

48.     Upon the effectuation of the merger and the conversion of the Diva preferred stock into IGIA common stock (to be exchanged on the merger), plaintiffs' IGIA common stock holdings (including shares of IGIA obtained as a consequence of Vertical's introduction of Tactica to Diva) were as follows:

| | |
|---|---|
| Global | 1,370,000 shares |
| Hughes | 1,057,500 shares |
| Allied | 352,750 shares |
| DePalo | 10,000 shares |
| Schonwald | 133,000 shares |

49.     Immediately prior to the closing of the merger transaction, defendant Zachariou resigned his positions as President and Director of Diva, and each of defendants Ramchandani, Sivan and Streams became IGIA officers and Directors.

50.     Pursuant to a Schedule 13D filing made with the SEC, on June 11, 2004, immediately subsequent to the merger, defendant Bar Lavi was issued 4,950,000 shares of IGIA stock and became

a 10.8% owner of the company. Upon information and belief, though not an officer or director of the company, since that time defendant Bar Lavi has consistently played an active daily role in the management and operations of the company.

51.     Upon information and belief, in the weeks and months following the closing of the merger transaction, the IGIA Defendants repeatedly disseminated false and misleading information regarding IGIA to the investment community, which was designed to and did artificially inflate the value of IGIA Stock. The basis for plaintiffs' information and belief in this regard is the IGIA Defendants' ability, as IGIA's management and corporate insiders, to disseminate information on its behalf and, as pled more fully below, that the information being disseminated was materially and knowingly false.

52.     During the period that the aforesaid false information was disseminated by defendants to the investment community, June 11, 2004 through October 17, 2004, IGIA stock was being traded in an open, developed and efficient market. Specifically:

    (i)     its price was displayed to the investment public in real-time quotes through the OTC Bulletin Board;

    (ii)    as of August 31, 2004, 17,913,140 shares of IGIA common stock were outstanding, and there existed a "public float" of 3,725,933 shares which were owned by non-insiders of the company;

    (iii)   During the relevant period, some 6,120,890 shares of IGIA were traded, representing an average weekly trading volume of 266,126 shares;

11

(iv)   IGIA was the subject of interest by analysts, as evidenced by its being featured as the "Highlighted Stock" in the September 2004 issue of the newsletter entitled "Richard Geist's Strategic Investing, An Independent Guide to Profitable Opportunities;" and

(v)   IGIA utilized the services of a public relations firm and issued press releases concerning its business operations.

53.   During this post-merger period in which the IGIA Defendants were fraudulently disseminating false information concerning Tactica's financial condition and prospects, the Diva Defendants, in furtherance of their scheme to profit from illegal short sales of IGIA common stock in an artificially inflated market, failed to disclose, and concealed, Tactica's true declining financial condition from the plaintiffs and the investment community.

54.   On July 21, 2004, in furtherance of their efforts to artificially inflate the value of their IGIA stock, the IGIA Defendants caused IGIA to issue a press release through PR Newswire which stated:

> We are extremely pleased to report profitability in the first quarter, which represents our significant progress in streamlining operations. We remain focused on expanding our globally recognized portfolio of brands and lines of consumer products.
>
> *   *   *
>
> [a]s a newly publicly-traded company through the merger of IGIA, Inc. and Tactica, we now operate from a platform poised for growth. We expect our trend of strong revenues and earnings to continue in the coming quarters.

(emphasis added).

55.     On August 2, 2004, the IGIA Defendants caused IGIA to issue another positive press release, which stated:

> The Company is continuing with its core business, which is cash flow positive with internal growth and had revenues of $6.6 million for the first quarter ending May 31, 2004. <u>The Company does not need additional funding to maintain its core business.</u> The Company is raising capital to finance the introduction and development of new product lines. (emphasis added).

Commenting on the decline in the Company's stock price, the press release attributed such decline to "…illegal short sales of the Company's common stock…"

56.     Three weeks later, on August 26, 2004, the IGIA Defendants caused IGIA to issue another press release through PR Newswire wherein it announced that:

> its relationship with Sands Brothers International, Ltd., which has acted as Financial Advisor for IGIA has expired and that IGIA has decided not to extend the relationship, and effective immediately Sands will no longer have any involvement or authority to offer securities, debt or act on behalf of the Company in any capacity.

In making this release, defendants failed to disclose that the termination of Sands Brothers, and its failure to accomplish an equity raise for the company, was expected by defendants to be economically disastrous for IGIA.

57.     Moreover, in the September 2004 issue of the newsletter entitled "Richard Geist's Strategic Investing, An Independent Guide to Profitable Opportunities," in which IGIA was featured as the "Highlighted Stock," the IGIA Defendants caused to be disseminated the following false and misleading information concerning IGIA:

> "…[IGIA] has stated that it does not need additional funding to maintain its core business.  With the stock below $1.00, we expect that the financing is on hold, but we expect the present business to continue to grow."

H:\S1103\0005\JL0082.DOC

"While the revenue trend appears to be down, there have been a number of events to suggest that IGIA is now well positioned to leverage its international brand equity into new product lines and seek out licensing agreements to enhance their top and bottom lines."

"…we expect revenues to grow as the second half of the year tends to be the company's strongest period."

"By adjusting its operations and development to the level of capitalization, management believes it has sufficient capital resources to meet projected cash flow deficits through the first quarter of fiscal 2006."

"…we believe this high risk investment has a good chance of returning profits to early and long focused investors who can tolerate high volatility.

58.     DePalo imparted the substance of each of the aforesaid press releases and representations by the IGIA Defendants to his colleagues at Vertical, including Ronald Heineman. Purchases were made for the benefit of plaintiff Susan Heineman (Ronald Heineman's wife) in reliance thereupon.

59.     In reliance upon both the integrity of the market and their belief that the market price of IGIA stock was an accurate measure of its intrinsic value, and their belief that the press releases and other positive information disseminated by the IGIA Defendants were true and accurate, the following plaintiffs made the following open market purchases of Tactica stock:

### Allied International Fund, Inc.

| Date | No. of Shares | Price per Share | Cost |
|------|---------------|-----------------|------|
| 6/22/04 | 1,000 | $2.970 | $2,970.00 |
| 7/1/04 | 7,500 | $2.400 | $18,000.00 |
| 7/1/04 | 4,000 | $2.300 | $9,200.00 |
| 7/14/04 | 5,000 | $1.520 | $7,600.00 |
| 7/15/04 | 2,000 | $2.050 | $4,100.00 |
| 8/10/04 | 82,500 | $0.640 | $52,800.00 |
| 8/13/04 | 15,200 | $0.878 | $13,345.60 |
| | | Total | $108,015.60 |

H:\51103\0005\JL0082.DOC

Global Asset Management

| Date | No. of Shares | Price per Share | | Cost |
|------|--------------|-----------------|--|------|
| 8/12/04 | 7,000 | $0.8071 | | $5,649.70 |
| 8/13/04 | 2,500 | $0.8000 | | $2,000.00 |
| | | | Total | $7,649.70 |

Hughes Holdings LLC

| Date | No. of Shares | Price per Share | | Total Cost |
|------|--------------|-----------------|--|-----------|
| 7/23/04 | 9,000 | $1.3 | | $11,700.00 |
| | | | Total | $11,700.00 |

Susan Heineman

| Date | No. of Shares | Price per Share | | Cost |
|------|--------------|-----------------|--|------|
| 7/21/04 | 2,500 | $1.58 | | $3,950.00 |
| 7/21/04 | 2,500 | $1.57 | | $3,925.00 |
| 10/1/04 | 15,000 | $0.30 | | $4,500.00 |
| | | | Total | $12,375.00 |

60.     On October 17, 2004, IGIA filed a Form 12b-25 Notification of Late Filing with the

Securities and Exchange Commission with respect to its inability to timely file its Form 10QSB

Quarterly Report for the period ended August 31, 2004.  The Form 12b-25 included the following

disclosure:

> IGIA, through our wholly-owned subsidiary Tactical International,
> Inc., a Nevada corporation ("Tactica"), sells a variety of personal care
> and other products to retailers and directly to consumers.  Tactica
> uses television and print media advertising extensively to promote
> sales in both segments.  Our total revenues for the six-month period
> ended August 31, 2004 were approximately $10 million as compared
> to $25 million for the same period ended August 31, 2003.  The
> decrease is primarily the result of a decrease in media advertising

> spending, which has a positive correlation to our revenues.... "
> (emphasis added)

This was the first disclosure by IGIA that its financial condition and prospects was anything but encouraging.

61.     Four days later, on October 21, 2004, Tactica filed a voluntary petition for relief under Chapter 11 Bankruptcy Code. In its October 21, 2004 8-K filing with the SEC, IGIA provided the following explanation for the filing:

> Despite numerous attempts to obtain financing prior to its filing for bankruptcy protection, Tactica was unable to do so. As a result of the foregoing factors, Tactica did not have a sufficient available source of working capital to continue its normal operation of business.

Clearly, this explanation is inconsistent with IGIA's repeated public pronouncements that the private placement funds which they had represented Sands Brothers was to provide was not necessary to the sustenance of Tactica's business.

62.     On November 15, 2004, IGIA finally filed a Form 10-QSB Quarterly Report with the Securities and Exchange Commission containing its financials for the three months ended August 21, 2004. Among other things, that report disclosed the following:

    a.     Revenues for the three months ended August 31, 2004 were $1,987,050 compared to $6,584,933 for the previous three months ended May 31, 2004 and $10,447,359 for the comparable period the prior year ended August 31, 2003.

    b.     Loss from Operations was $6,355,660 for the three months ended August 31, 2004 compared to a profit of $515,458 for the previous three months ended May 31, 2004 and a

16

loss of $3,816,901 for the comparable period the prior year

ended August 31, 2003.

63.    Also in its Form 10-QSB filing, IGIA disclosed extensive liabilities owed to its

warehouseman, Innotrac Corporation, which were the immediate cause of Tactica's bankruptcy

filing:

> In the ordinary course of Tactica's business, Innotrac warehouses Tactica's products, processes orders and inventory and ships these products to Tactica's customers. <u>Tactica asserts that the value of its inventory held at Innotrac's facility is approximately $9 million. Innotrac informed Tactica that Innotrac would not permit Tactica to remove its inventory stored with Innotrac unless Tactica paid Innotrac all amounts allegedly due. Despite numerous attempts to obtain financing prior to its filing for bankruptcy protection, Tactica was unable to do so. As a result of the foregoing factors, Tactica did not have a sufficient available source of working capital to continue its normal operation of business.</u> Although Tactica and Innotrac attempted to reach an out of court agreement to resolve the terms of payment to Innotrac, the terms could not be agreed upon. The parties agreed upon the terms of the Stipulation which contemplated the filing of a bankruptcy petition and Bankruptcy Court approval.

> \*                    \*                    \*

> In the ordinary course of its business, Innotrac provided warehousing, sale order processing and fulfillment services to Tactica provided that the balance owed for such services was within an acceptable range. <u>At times during the six months ended August 31, 2004, due to our low level of working capital, sales order processing was temporarily suspended.</u> In addition, we invested less in acquiring new inventory which has delayed fulfillment of customer orders.

(emphasis added)

64.    None of this material adverse information concerning Tactica's inability to obtain the

release of $9,000,000 of its own inventory for sale was previously disclosed by IGIA, nor was the

material fact that the inventory was subject to Innotrac's secured lien. In addition, these disclosures

17

in the Form 10-QSB were contrary to the positive and encouraging statements and misrepresentations made by IGIA in its press releases and other disclosures and public filings during the preceding months, including but not limited to the obviously false statements that it did not need to raise funds for working capital purposes.

AS AND FOR A FIRST CLAIM
(Against all defendants, except IGIA)
(For violations of §10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b))

65.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 64 above as if the same were fully set forth herein.

66.     Upon information and belief, the IGIA Defendants intentionally caused IGIA to disseminate information to the investing public which they actually knew falsely portrayed Tactica as financially sound and poised for growth. The basis for plaintiff's belief in this regard is: (a) the IGIA Defendants' familiarity and involvement with the operations of the company; (b) the IGIA Defendants' failure to disclose until after Tactica's bankruptcy that sales order processing had been suspended because of lack of funds; and (c) the fact that within five (5) months of defendants' representations that Tactica was a strong company "poised for growth," the company filed for bankruptcy protection and had irrefutably been in decline. Indeed, for the three (3) month period ended August 31, 2004 revenues were $1,987,050, compared to $6,584,933 for the previous three (3) months ended May 31, 2004, and $10,447,359 for the same period during the prior year. In addition, the IGIA Defendants had the opportunity to provide and disseminate the aforesaid material false information in that they knew of Tactica's true financial condition, and had the ability to disseminate information on the company's behalf.

67.     Upon information and belief, each of the Diva Defendants had actual knowledge that the information being disseminated by the IGIA Defendants was false in material respects. The basis for plaintiffs' belief that these defendants knew that the information being disseminated by the IGIA Defendants was false are the facts that (a) these defendants were provided full and complete access to Tactica's auditors and financial information during the due diligence period prior to the merger, and could not possibly have been unaware of the company's true financial outlook; and (b) that each of these defendants had a motive for failing to disclose this non-public information concerning Tactica's true financial condition and prospects; specifically, their scheme to pump value into worthless Diva stock through the merger, and to subsequently engaging in short selling of IGIA stock at the inflated prices, against the "box" of IGIA stock obtained in the merger, knowing that IGIA's price would decline as its actual financial condition became publicly known.

68.     The information possessed by the Diva Defendants as to Tactica's true financial condition was material non-public information that a reasonable investor would have deemed relevant to their decision to invest in IGIA.

69.     As such, each of the Diva Defendants had a duty to publicly disclose this non-public information in their possession to Plaintiffs, and to refrain from trading upon it.

70.     Upon information and belief, the IGIA Defendants' dissemination of false information concerning Tactica's financial condition and prospects, and the Diva Defendants' failure to publicly disclose that this information was false, was intended, inter alia, to induce the plaintiffs to purchase and hold their IGIA stock, thereby to avoid downward market pressure, and thereby to sustain an artificially high current sale price for their IGIA shares.

19

71.     Upon information and belief, defendants' motivation for artificially inflating the value of IGIA's stock, and creating a more liquid market was, in the case of the IGIA Defendants, to enhance IGIA's ability to raise badly needed working capital, and, in the case of the Diva Defendants, to facilitate their scheme to illegally engage in short selling of IGIA stock based upon their possession of non-public information concerning its true, and declining, financial condition. Plaintiffs' belief in this regard is based upon the facts that: (a) Tactica's ultimate demise was admittedly to a large extent the result of its undisclosed inability to raise sufficient working capital during the period immediately prior to and following the merger; and (b) upon information and belief, the Diva Defendants, in the weeks and months following the closing of the merger transaction, actually engaged in extensive short selling of IGIA stock.

72.     Each and all of the plaintiffs relied upon the false information disseminated by the IGIA Defendants concerning Tactica's financial condition and prospects in determining to make their open market purchases of IGIA stock, and would not have made those purchases had they been made aware of the non-public negative financial information which the Diva Defendants possessed, and failed to disclose.

73.     In addition, and in the alternative, each and all of the plaintiffs made their open market purchases of IGIA stock based upon the integrity of the market, and relied upon the market price of IGIA stock as an accurate measure of its intrinsic value.

74.     Plaintiffs made their open market purchases of IGIA stock in an open, developed and efficient market.

75.     Each of defendants' aforesaid false representations and omissions were made in connection with the purchase and sale of a security.

H:\51103\0005\JL0082.DOC

76.    Each of the IGIA Defendants aforesaid false representations were material, as were the aforesaid fraudulent omissions by each and all of the Diva Defendants.

77.    Defendants' aforesaid false dissemination of materially false information to the investment public was made by a means or instrumentality of interstate commerce or of the wires and/or mails.

78.    As the direct and proximate result of defendants' false representations and omissions, and the short selling by the Diva Defendant's, the share price of plaintiffs' IGIA holdings dropped from approximately $5.00 immediately subsequent to the closing of the merger transaction, and are virtually worthless today.

79.    As the result of the aforesaid fraudulent misrepresentations and omissions:

      (i)     plaintiff Allied has sustained damages in the amount of $108,015.60;

      (ii)    plaintiff Hughes has sustained damages in the amount of $7,649.70;

      (iii)   plaintiff Global has sustained damages in the amount of $11,700; and

      (iv)   plaintiff Heineman has sustained damages in the amount of $12,375.

### AS AND FOR A SECOND CLAIM
(Against all defendants, except IGIA)
(For Common Law Fraud)

80.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 79 above as if the same were fully set forth herein.

81.    In reliance upon the aforesaid false and fraudulent representations by the IGIA Defendants as specifically alleged above, each and all of the plaintiffs made open market purchases of IGIA Stock in the amounts specifically alleged above.

21

82.     In addition, none of the plaintiffs would have made these open market purchases if they had been aware of the material non-public negative financial information concerning Tactica which the Diva Defendants knew but failed to disclose, notwithstanding that they themselves illegally traded upon it.

83.     Upon information and belief, for the reasons explained above, all such conduct by all defendants was knowing and willful.

84.     As the result of the aforesaid fraudulent misrepresentations:

    (i)     plaintiff Allied has sustained damages in the amount of $108,015.60;

    (ii)    plaintiff Hughes has sustained damages in the amount of $7,649.70;

    (iii)   plaintiff Global has sustained damages in the amount of $11,700; and

    (iv)    plaintiff Heineman has sustained damages in the amount of $12,375.

**AS AND FOR A THIRD CLAIM**
(Against all defendants except IGIA)
(For Common Law Fraud)

85.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 84 above as if the same were fully set forth herein.

86.     Immediately subsequent to the effectuation of the merger transaction between Diva and Tactica each of the plaintiffs held the following number of freely tradable shares of IGIA common stock:

| Global | 1,370,000 shares |
|--------|------------------|
| Hughes | 1,057,500 shares |
| Allied | 352,750 shares |
| DePalo | 10,000 shares |
| Schonwald | 133,000 shares |

H:\51103\0005\JL0082.DOC

87.     Immediately subsequent to the merger transaction, IGIA common stock was priced as high as $5.00 per share.

88.     Based upon the aforesaid misrepresentations and omissions of the defendants, plaintiffs determined to hold a significant portion of their stock and, indeed, as pled above, to purchase more, notwithstanding that the price of IGIA stock was declining.

89.     Had the plaintiffs been made aware of the non-public negative financial information which the defendants possessed, and failed to disclose, they could have immediately sold their IGIA holdings for as high as $5.00 per share, and would have sold in a reasonably prompt time thereafter.

90.     By the time that the negative financial information concerning Tactica which was concealed by defendants became publicly known, plaintiffs' IGIA holdings had been rendered virtually worthless.

91.     Based upon the foregoing, and as the direct and proximate result of the defendants' aforesaid fraudulent representations and omissions, each of the plaintiffs has sustained damages in an amount to be calculated and established with certainty, determined, at trial.

<u>AS AND FOR A FOURTH CLAIM</u>
(Against IGIA)
(For breach of Contract)

92.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 64 above as if the same were fully set forth herein.

93.     The Merger Agreement, (¶3.2), restricted future share issuance by IGIA as follows:

> The parties hereto agree that for a period of at least one year
> following the Effective Time, the Surviving Corporation shall issue
> no new shares of any class other than (a) shares issued in connection
> with a bona-fide acquisition of another company; (b) shares issued in
> connection with a financing of at least $7,500,000 with the Surviving
> Corporation's shares being priced at no less than the greater of $1.00

23

or 75% of the closing bid price of the Surviving Corporation's Common Shares on the closing date of such financing or (c) an underwritten public offering of the Surviving Corporation's Common Shares at a price greater than $1.00 per share.

94.     On March 23, 2005 IGIA filed a Form 8-K Report with the Securities and Exchange Commission announcing that it had authorized for issuance 50,000 shares of Series G Preferred Stock with a par value of $.001 per share and a stated value of $0.03 per share. The Form 8-K Report also announced that IGIA issued 25,000 shares of Series G Preferred Stock to each of Avi Sivan and Prem Ramchandani.

95.     In addition, on April 20, 2005 IGIA filed another Form 8-K Report with the Securities and Exchange Commission announcing that on March 23, 2005 it had entered into an agreement with certain investors for the sale of $3 million in callable secured convertible notes and stock purchase warrants to buy 6,000,000 shares of IGIA common stock. The conversion price for the notes is described as the lower of $0.04 per share or 50% of the average of the three lowest intraday trading prices for IGIA common stock during the 20 days before, but not including, the conversion date.

96.     Inasmuch as the per share price of the preferred shares issued to the IGIA Defendants is less then $1.00 per share, and since the conversion and exercise rights under the notes and warrants entitle the holders thereof to obtain IGIA stock for less then $1.00 per share, the issuance of the preferred stock and the convertible notes and warrants constitutes a breach by IGIA of its obligations under the Merger Agreement.

97.     As the result of this breach, and as the result of the consequent dilution of their IGIA holdings, plaintiffs have sustained damages in an amount to be determined at trial.

24

H:\51103\0005\JL0082.DOC

•

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

WHEREFORE, plaintiffs demand judgment against defendants:

A.    On their first claim, against all defendants, as follows:

        (i)    in the amount of $108,015.60 in favor of Allied International Fund, Inc.;

        (ii)    in the amount of $7,649.70 in favor of Hughes Holdings, LLC;

        (ii)    in the amount of $11,700 in favor of Global Asset Management LLC; and

        (iii)    in the amount of $12,375 in favor of Susan Heineman;

together with appropriate interest and costs;

B.    On their second claim, against all defendants, as follows:

        (i)    in the amount of $108,015.60 in favor of Allied International Fund, Inc.;

        (ii)    in the amount of $7,649.70 in favor of Hughes Holdings, LLC;

        (ii)    in the amount of $11,700 in favor of Global Asset Management LLC; and

        (iv)    in the amount of $12,375 in favor of Susan Heineman;

together with punitive damages in the amount of $1,000,000, and appropriate interest;

C.    On their third claim, against all defendants, in an amount to be established at trial, together with punitive damages in the amount of $1,000,000, and appropriate interest;

25

D.     On their fourth claim, against IGIA, in an amount to be established at trial.

E.     On all of its causes of action, for the costs and disbursements incurred in connection with this action; and

F.     For such other and further relief as to this Court seems just and proper.

Dated: New York, New York
       December 2, 2005

                         Respectfully submitted,

                         KURZMAN  EISENBERG  CORBIN  LEVER  &
                         GOODMAN, LLP

                         By: _____
                             Andrew J. Goodman, Esq. (AG-3406)
                             Ross J. Ellick, Esq. (RE-9117)
                             Members of the Firm
                             Attorneys for Plaintiffs
                             675 Third Avenue, Suite 1800
                             New York, New York 10017
                             (212) 661-2150

H:\S1103\0005\JL0082.DOC